[Civ. No. 1710. Fourth Appellate District.—October 17, 1935.]

B. E. RYDER, as Executor, etc., Respondent, v. GEORGE W. YOUNG et al., Defendants; S. F. MARGOZEWITZ et al., Appellants.

Edw. F. Wehrle, Anderson & Anderson, Earl E. Johnson, Arch H. Vernon and Gilbert E. Harris for Appellants.

Goodspeed, Pendell & McGuire for Respondent.

BARNARD, P. J.—This is an action to quiet title to a lot in New Vernon, in Los Angeles County.

On March 1, 1917, Carrie E. Wilcox, who then owned this lot, executed, acknowledged and recorded two deeds. The first of these described this lot and purported to convey the same to the defendant George W. Young. The second, recorded one minute after the first, purported to convey to Bertha D. Ireland, a sister of Mrs. Wilcox, "all my real property, wheresoever the same may be situate". The record remained in that condition until after the death of Mrs. Wilcox, which occurred about 4 o'clock A. M. on January 8, 1929. About 9 A. M. on that day, and before she had learned of her sister's death, the defendant Ireland executed and acknowledged a quitclaim deed conveying her interest in the property to Mrs. Wilcox. About fifteen minutes later she delivered this deed to B. E. Ryder, who had been named executor in Mrs. Wilcox's will. Ryder was appointed executor of the estate of Mrs. Wilcox by the Superior Court of Los Angeles County on March 15, 1929, and this quitclaim deed was recorded in the following June.

On October 19, 1929, attorneys for Mrs. Ireland filed an action in Los Angeles County seeking to quiet her title to this lot and naming George W. Young and B. E. Ryder, executor of the estate of Jessie Wilcox, deceased, as defendants. The complaint was verified by Harold E. Leddy as one of Mrs. Ireland's attorneys. Summons was issued but was never served on either of the defendants named. In the latter part of 1929 Leddy, acting as attorney for Mrs. Ireland, arranged to sell this lot to the defendant S. F. Margozewitz, who started an escrow with the First National Bank of Vernon, where he did business, at some time prior to December 9, 1929. Both he and Mrs. Ireland gave the bank written escrow instructions under which he was to pay $4,500 for the property and was to receive a grant deed from Mrs. Ireland with an owner's policy of title insurance from a title company. He paid a part of the purchase price into the escrow, a portion of which was used in attempting to clear the title. Among other things, $250 was paid to George W. Young for a quitclaim deed to Mrs. Ireland, which was dated January 17, 1930. The escrow agent secured a preliminary report from a title company stating that the title was "apparently vested in

George W. Young'', and that a quiet title action instituted by Bertha D. Ireland was pending in the superior court. A grant deed from Bertha D. Ireland to S. F. Margozewitz was acknowledged on December 3, 1929, before a Philadelphia notary public and was recorded February 11, 1930, and the escrow was closed. Mrs. Ireland, who at all times material here was a resident of Philadelphia, was not in California during the time the sale of the property was in progress and the entire matter was handled for her here by her attorney, Leddy.

In this action which followed the court found upon ample evidence that the deed of March 1, 1917, from Carrie E. Wilcox to George W. Young was, in fact, an equitable mortgage. The court also found that Carrie E. Wilcox was the owner of the property up to her death and that the same now belongs to her estate; that George W. Young, in consideration of the payment to him by Bertha D. Ireland of his mortgage indebtedness in the sum of $250, executed and delivered to her a quitclaim deed releasing all of his rights in the premises; that the said Bertha D. Ireland was at that time fully advised and had actual knowledge as to the rights of Young and of the fact that he held the record title to the premises as security only for the payment of the indebtedness; that at the time the property was sold to S. F. Margozewitz for $4,500 the same was of the reasonable value of $6,600; and that at the time he purchased the property the said S. F. Margozewitz had notice and was chargeable with constructive knowledge of facts and circumstances which should have put a reasonable person on inquiry and from which inquiry he would have ascertained that Bertha D. Ireland acquired no title to the premises through the quitclaim deed she received from George W. Young and that the premises were, in fact, owned by the estate of Carrie E. Wilcox, deceased. Judgment was entered in favor of the plaintiff and the defendants Margozewitz have appealed.

Appellants' main contentions are that the evidence is not sufficient to sustain the findings to the effect that title to this property remained in Carrie E. Wilcox and her estate, and to the effect that the appellants were chargeable with notice as to the rights of the respondent. The appellants contend that since the deed to Young of March 1, 1917, was merely a mortgage, title passed to Bertha D. Ireland under the deed to

her of that date, where it has remained ever since. In this connection it is argued that the description in the deed last referred to is sufficient since it covers all the property the grantor had, that acceptance of the deed and a consideration must be presumed, the deed having been recorded, and that the deed from Mrs. Ireland to Mrs. Wilcox, having been executed and delivered after the death of Mrs. Wilcox, is not only void as a legal instrument but cannot be considered for any purpose.

In our opinion, the evidence sustains the trial court's findings and conclusion to the effect that the title to this property did not pass to Bertha D. Ireland through the deed executed by Carrie E. Wilcox on March 1, 1917. Much argument is presented by both parties on the question as to whether the description in this deed is sufficient to pass title to this property and the following cases are cited: *Brusseau* v. *Hill,* 201 Cal. 225 [256 Pac. 419, 55 A. L. R. 157]; *Pettigrew* v. *Dobbelaar,* 63 Cal. 396; *Oatman* v. *Niemeyer,* 207 Cal. 424 [278 Pac. 1043]; *Saterstrom* v. *Glick Bros. Sash, Door & Mill Co.,* 118 Cal. App. 379 [5 Pac. (2d) 21]. Assuming that the description in this deed was sufficient to pass title in a proper case and especially where the equities were in favor of the grantee, other important questions remain as to whether that deed was intended to pass title, whether there was a consideration therefor and whether there was an acceptance on the part of the grantee named therein. The appellants argue that the presumption in all these respects is in their favor since the deed was recorded and since there was a notation thereon that it was recorded at the request of the grantee. Any such presumptions seem to have been pretty thoroughly overcome by the evidence.

It appears that Mrs. Wilcox deeded this property to her sister fearing that her stepdaughters would claim it and desiring to retain it for her support in her old age. While some hearsay evidence was admitted, the following facts are sustained by competent evidence: Mrs. Wilcox continued to claim to be the owner of the property up to the time of her death and Mrs. Ireland asserted no claim thereto, directly or indirectly, while her sister was alive. While the property was a vacant lot, an ornamental signboard was maintained thereon by Foster & Kleiser for a number of years before the death of Mrs. Wilcox under a written lease from her dated in

1927, but reciting that it ran for ten years from and after 1925, the rental being collected by Mrs. Wilcox. After her death, tax receipts for each of the years 1917 to 1928, inclusive, with the exception of the years 1918, 1919 and 1925, were found in her effects. On December 17, 1918, Mrs. Wilcox, who was then sick in a hospital, sent a telegram to her sister in Philadelphia saying "Please sign deed at once as you promised and return today. Cash all gone." Instead of answering this telegram direct Mrs. Ireland wrote to Dr. Ryder as follows: "I just received your letter regarding my sister, Mrs. Carrie Wilcox, and wish to thank you for it. As I have before written you, I am not able to give any more than ten dollars per week, which I am sending at present. I mailed her a check on December 11th to the California hospital for twenty dollars, which I presume she received. I am perfectly willing to sign a deed to my sister for any property she may have in California which she has placed in my name. She must realize that I do not know what property, if any, she has put in my name, as I have no papers in the matter. I would suggest that she get a trust company to prepare a deed from myself to her for the property, which I will sign and properly execute and return, after which she may sell the property or do with it as she pleases. So far as I can understand, this property, about which she speaks, must be her only remaining asset, and I want to make myself perfectly clear, that if she does sell and thereby exhaust her last possible channel from which to get any money, I expect to discontinue my payments of ten dollars per week, as I feel, if properly managed, the cash she will receive from the sale will be ample to take care of her. I am enclosing a telegram which I received Saturday morning, but did not reply as this letter to you will explain and you can show or read it to her. My sister has never told me anything about her affairs or business, so, of course, I do not know anything." After receiving that letter Dr. Ryder had a quitclaim deed prepared conveying the property from Mrs. Ireland to Mrs. Wilcox, which he sent to Mrs. Ireland at Philadelphia for her to execute. Mrs. Ireland did not immediately execute the same but soon thereafter came to California, arriving shortly before Mrs. Wilcox died. Dr. Ryder testified that on the afternoon before Mrs. Wilcox died Mrs. Ireland came to his office and he told her at which hospital Mrs. Wilcox could be found.

Later that day, this witness heard a conversation between Mrs. Wilcox and Mrs. Ireland in which Mrs. Wilcox asked her sister if she had executed the paper which had been sent to her. Mrs. Ireland replied: "Not yet." Mrs. Wilcox then said: "I don't see why you haven't done that because you promised to and I need the money very badly." Mrs. Ireland then replied: "I will go right down and fill it out right away. . . . I don't care what you do with your property, you can give it to any Tom, Dick, or Harry, I did not know you had any property in my name and if you have any of it in my name I will be glad to turn it back to you. I will go right down town and do it now." The next morning Mrs. Ireland signed and acknowledged the quitclaim deed conveying the property to Mrs. Wilcox, and delivered the same at Dr. Ryder's office without knowing that her sister had died a few hours before.

In her deposition, which was admitted in evidence, Mrs. Ireland testified that she had lived in Philadelphia for about forty years; that she had never had any business dealings with George W. Young; that he had never deeded the property here in question or any other property to her; that she had never paid any money through her attorney or otherwise for this lot; that she had not seen the lot and did not know where it was or anything about it; that she had never paid any money to George W. Young or had anything to do with him; that she sold the lot to S. F. Margozewitz; that she did not know what the selling price was or anything about the transaction as it was all handled by her attorneys, mostly by Mr. Leddy; that she did not recall ever receiving a deed to the lot from George W. Young; that she knew nothing about its value or what its value was at the time she sold it to Margozewitz; that she did not know whether or not that was a cash sale; and that she did not know whether or not the sale was handled through an escrow. When asked if she ever paid any taxes on the lot she replied: "I gave the money to my sister and she paid them. I didn't pay them direct." She testified that she did not know what the taxes amounted to; that her sister had written saying she needed money for taxes but did not state the amount due; that she had no recollection of how much she had sent for taxes and did not know the amount of any assessments; that she could not remember how much money she had sent at any time or altogether; that she

had never paid her sister anything for the lot; that she received a deed in 1917 but that she did not have it recorded and did not know whether it had ever been recorded; and that her sister asked her to give her a deed the night before she died and she told her she would do so the following morning.

It appears from the evidence that Mrs. Ireland knew practically nothing about this transaction and that the sale of the lot and the matter of attempting to establish title in Mrs. Ireland were handled by her attorney, Leddy. In her escrow instructions to the bank Mrs. Ireland stated that the property was being sold to Mr. Margozewitz for $4,500; that they were authorized to secure an owner's policy of title insurance "in which I guarantee to be able to show the above described property vested in my name"; that the property "is now clouded by instruments of record", but that the title was being cleared by her attorneys through a quiet title action then pending; that the escrow was to continue in force until thirty days after said quiet title action was completed; and that the escrow agent was authorized to pay to Mr. Leddy 25 per cent of the net proceeds of the selling price being paid by Mr. Margozewitz.

George W. Young placed a quitclaim deed in the escrow. In his instructions he stated that he was to receive $250 from Mrs. Ireland's share of the net proceeds of the escrow; that his deed was "to be considered a final disposition of the property in any event"; that he would sign any other paper necessary to carry out his agreement with Mrs. Ireland and Mr. Leddy; that he agreed to the dismissal of the quiet title action then pending; that he would deliver, if demanded, a disclaimer of any interest in the property; that he waived any and all claims against Mrs. Ireland and the "estate of Carrie Wilcox"; and that "in the event the present action goes to trial, I will appear as a witness and do all in my power to assist Mrs. Ireland or her successors in obtaining a clear title to this property". Mr. Young testified at the trial that before putting his quitclaim deed in escrow he told Mr. Leddy that the deed from Mrs. Wilcox which he received in 1917 was given to him as security for money he had loaned her.

While the escrow was pending Mr. Leddy wrote to the escrow agent as follows: "I wish to express to you my sincere appreciation of the very intelligent assistance you gave me in dealing with George W. Young yesterday. I feel that

he is going to accept our offer and that the deed will soon be in your possession. I believe it advisable to place these deeds on record and to use every effort to obtain guaranty of title without the necessity of completing the present action to quiet title. The chain of title from Wilcox to Young to Ireland to Margozewitz cannot be in any manner attacked by the estate of Wilcox. If any references are made to the deed from Ireland to Wilcox, the point should be stressed that the original deed from Wilcox to Ireland conveyed title only to such property as Mrs. Wilcox then possessed, and at the time of recordation and probably at the time of delivery of this original Wilcox to Ireland deed both title and possession were in George W. Young. . . . I would further suggest that Mrs. Ireland be requested to give additional instructions to cover the Young matter, and that she confirm the instructions of Mr. Conwell relative to the costs, expenses, and my fee. If Mr. Margozewitz can be persuaded to accept a guaranty which would insure the property to be in his name free of all claims, except such as the Estate of Wilcox might prove to have, I would agree after the dismissal of the present action to bring an action in his name, without charge to him, against the Executor of the Wilcox Estate to clear this apparent flaw in his title. With an innocent purchaser as plaintiff, and with only the Estate as defendant, the case would present no difficulties. This would enable us to make a disposal of the purchase price and would simplify matters considerably.''

It fully appears that Mrs. Ireland and her agents, Leddy and the bank, had full knowledge of the deed to Mrs. Wilcox which was executed and delivered after her death by Mrs. Ireland, of the action brought by Mrs. Ireland to quiet title to this property, of the pendency of the estate proceedings and of the fact that the estate of Mrs. Wilcox claimed to be the owner of this property. While the escrow was pending Mrs. Ireland's attorney in Philadelphia wrote a number of letters to the escrow agent all of which were headed: ''Re: Estate Carrie Wilcox''. It also appears that Mrs. Ireland's attorney, Leddy, after securing the quitclaim deed from George W. Young, abandoned the quiet title proceeding and dismissed the same without serving the executor of Mrs. Wilcox's estate and persuaded the title company that the deed executed by Mrs. Ireland after the death of her sister was of no effect. While this deed was not sufficient to pass a title it was not

without an important effect, in connection with other evidence, in showing the actual situation between the parties. Without knowing anything about the value of the property Mrs. Ireland was willing to leave the matter entirely in the hands of her attorney and take what she could get less a fee of 25 per cent. Her own attorneys in Philadelphia handled the matter as something coming to her from the estate of her sister. While Mrs. Ireland had directed that the escrow remain open until the quiet title action was completed, this was not done and, apparently, she did not even know that that action was dismissed and the matter closed in another way. As between the original parties themselves, we think the court's finding that the real ownership did not pass to Mrs. Ireland is fully sustained by the evidence.

It is earnestly contended by the appellants that, irrespective of the situation as between Mrs. Ireland and Mrs. Wilcox, they are innocent purchasers for value who relied only on the record title and who had no knowledge, constructive or otherwise, of any fact or circumstance which should have put them upon their guard or cause them to make any investigation as to the facts. This contention is not borne out by the record. The escrow agent had full and complete knowledge of practically all of the facts which have been mentioned, including the facts that a quiet title action had been started against the estate of Mrs. Wilcox, that Young did not claim to own the property, that the deed from Mrs. Ireland to Mrs. Wilcox was on record, that the property was leased to Foster & Kleiser for billboard purposes and the rental was to be prorated, and that the property was being claimed by the estate of Mrs. Wilcox. It is well settled that an escrow agent is the agent of both parties to such a transaction (*Shreeves* v. *Pearson,* 194 Cal. 699 [230 Pac. 448]). And further that the knowledge possessed by such an agent is to be imputed to each of the parties to the escrow (*Early* v. *Owens,* 109 Cal. App. 489 [293 Pac. 136]; *Smith* v. *Brown,* 1 Cal. App. (2d) 492 [36 Pac. (2d) 1081]).

The record also shows that the appellant S. F. Margozewitz had actual knowledge of facts which should have put him upon his guard and which were sufficient to place upon him the duty of making an investigation which would inevitably have led to the discovery of the other facts referred to. He was paying $4,500 for property which the court found was

then worth $6,600. He himself started the escrow and agreed to pay all of the escrow agent's expenses if the escrow was not completed. He knew that the signboard was on the property and stipulated that the rental therefor was to be pro-rated. While he testified that he knew nothing about the former owner of the property, he told one of the witnesses that the property could be purchased cheap as the old lady who owned it was dead. Mr. Leddy testified that he discussed with the escrow agent, the bank, the matter of the deed from Mrs. Ireland to Mrs. Wilcox being on record. He also testified that while the escrow was pending he had a talk with Mr. Margozewitz in which they discussed the fact that there was a deed on record from Mrs. Ireland to Mrs. Wilcox; that they had anticipated holding up the escrow until that matter was cleared up; that Mr. Margozewitz was willing to leave his money in escrow until this matter could be cleared up; that in this conversation he told Mr. Margozewitz that he had convinced the title company that the original deed from Wilcox to Ireland was valid and that the deed from Ireland to Wilcox was invalid; and that this pleased Mr. Margozewitz. In fact Mr. Margozewitz was so much pleased that the next day he gave the escrow agent an order to advance Mr. Leddy $200 on his fee, authorizing them to deduct the same from his deposit in the event the escrow was not closed. In our opinion, the knowledge possessed by the escrow agent and the actual knowledge possessed by Mr. Margozewitz was sufficient to support the court's finding that he had notice, actual and constructive, and that he was not an innocent purchaser for value. That he chose to rely upon a policy issued by a title company is something with which the respondent is not concerned and is no defense in this action.

Other points are raised by the appellants, including a large number of objections to the admission of evidence, all of which need not be considered under our view that the essential findings are supported by the evidence.

The judgment appealed from is affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 16, 1935.